UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 860 |
| v. | ) | |
| | ) | Judge William J. Hibbler |
| MATTHEW NOLAN | ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully files this position paper pursuant to Local Criminal Rule 32.1(g).

**A.     The Offense**

On March 10, 2005, United States citizen Robert Cohen was found dead under a bridge on in Costa Rica. An investigation of his murder led Costa Rican authorities to charge defendant with kidnapping, murder, and use of a false document.

Based on the evidence in Costa Rica, a warrant for defendant's provisional arrest with the view towards extradition was obtained in the Northern District of Illinois. On February 26, 2009, the FBI arrested defendant in Chicago and he was ordered detained at the Metropolitan Correctional Center ("MCC") pursuant to Article 12 of the extradition treaty between the United States and Costa Rica.

**1.     Obstruction of Justice**

On the day of defendant's arrest, Individual A (as identified in the indictment) provided the FBI written consent to search the defendant's residence located on south Euclid

1

Avenue, Chicago, Illinois.  During the search, the FBI questioned Individual A about the

contents of a floor safe located on the second floor of the residence.  Individual A told the

FBI that she did not know the combination to the safe and that the safe had not been used in

2 years.  Individual A also told the FBI that she believed that the safe was empty.  The FBI

relied on Individual A's statements and left without searching the safe.

On March 3, 2009, the Bureau of Prisons ("BOP"), as part of its inmate telephone

monitoring procedure, recorded a phone conversation between defendant and Individual A.

During the phone conversation, defendant, using coded language, directed Individual A to

destroy or otherwise conceal the contents of the safe in order to prevent law enforcement

from discovering its contents.  The pertinent parts of the conversation between defendant and

Individual A are transcribed below:

        *               *               *

| | |
|---|---|
| Defendant: | You know there's a leak in the front hall bedroom . . . you know? |
| Individual A: | Right. |
| Defendant: | Well, you know, I'd make sure everything is safe.  I don't think its safe. I think its gotta go maybe somewhere else for a different something else you know? |
| Individual A: | Okay, not in the safe? |
| Defendant: | (Sigh) . . . I think somewhere else, . . . you know? . . . Unconventional. |
| Individual A: | The FBI came to the house. |
| Defendant: | Yeah, I understand that, what did they do? |

Individual A:     Well . . . I, you know . . . I told them I didn't have the num . . . combination, that it hadn't been used in two years.

Defendant:     Good . . . okay . . . so everything especially those, ah . . . the check . . . you should check three things, and those should go bye-bye.

Individual A:     Okay that's my next question.

Defendant:     Maybe keep a couple, but the rest, go put them in like the most . . . and uh, as for the like the iron thing, and anything else . . . and ah like . . . any plane tickets, bus tickets, whatever . . . they should go . . . somewhere safer, but more unusual . . . you know what I mean?

Individual A:     Ahh okay.

Defendant:     Unusual you know? You know?

Individual A:     Yeah I'll try . . . I think I know . . .

Defendant:     I'm going commando at the moment, but it would have to be . . . I don't have any . . . but I would think someone, you know, like that. You know?

Individual A:     Okay.

\*          \*          \*

Individual A:     I gave the FBI . . ., I know I probably shouldn't have, but I'm trying to prove to them that you're like a . . .

Defendant:     It doesn't matter, you shouldn't have done that.

Individual A:     I know.

Defendant:     It doesn't matter, you've done everything else right. Just make sure that, that ticket is ah . . . you know, available.

Individual A:     It is.

*    *    *

Defendant:  . . . the fact that you let them into the hou, h-o-u, you did?

Individual A:  Yeah.

Defendant:  And you didn't remember the combin . . . , good, thank God, . . . so everything, all that stuff has to go bye-bye.  Not necessarily like you know don't throw it away because there is stuff there, but unconventional things.  You know? You know what I mean?

Individual A:  Yeah but, I . . . well okay.

Defendant:  It should not be there.  You know?

Individual A:  Alright . . .

*    *    *

On March 19, 2009, the FBI executed a search warrant at defendant's residence seeking evidence related to the offense of obstruction of justice, escape, and murder-for-hire. The FBI recovered the safe and found that the safe had been emptied.

### 2.  Possession of Contraband

On March 11, 2009, defendant's cell was searched by MCC officials.  Officers recovered approximately 31 feet of braided roping material, a similarly braided harness, a metal clip from a pen cap, and a broken piece of a razor blade hidden in defendant's bar of soap.[1]  Officers at the MCC were successful in opening a locked pair of handcuffs with the metal clip.

---

[1]Photos of the items recovered from defendant's cell are attached to this filing.

Between February 26, 2009, and March 11, 2009, defendant communicated multiple times with Individual B about escaping from the MCC. Defendant and Individual B generally communicated with each other about the escape in writing. Defendant used coded language to discuss the escape. Defendant used the words like "beach party" or "beach" to mean escape and "ice cream" to mean money.

In one note from defendant to Individual B, defendant wrote "You are right about my situation. If they get me down to the Southern CRoss [sic] I won't be coming back," referring to his extradition to Costa Rica. Defendant then wrote "I think we have to develop a way to get to the beach and buy some ice cream for our guides," meaning plan an escape from the MCC and obtain money to facilitate the escape.

In another note from defendant to Individual B on or about March 7, 2009, defendant wrote "My thought was tape the window, crack, mount rope w/ rope sleeve and rope bag . . . rappel to street + friends . . . . Trigger man runs the op from parking garage," meaning he would rappel out of a window to escape from the MCC and have another individual outside the MCC to aid him in his escape. A few days later, on or about March 9, 2009, defendant wrote "I do need tools, razors and sheets if you have them," referring to the materials he needed to make the rope and harness he would use to facilitate his escape from the MCC.

## B. A Guideline Sentence is Appropriate

As a matter of process, during a sentencing proceeding a district court should properly calculate the guideline range, treat the guidelines as advisory, consider the § 3553(a) factors,

and adequately explain the chosen sentence, including an explanation for any variance from the guideline range. *Gall v. United States*, 522 U.S. 38, 48-49 (2007). The U.S. Probation Office correctly calculated defendant's guideline range as 12 to 18 months' imprisonment.

In this case, a guideline sentence would be consistent with the factors of § 3553(a). A guideline sentence would reflect the nature and circumstances of the offense; seriousness of the offense; history and characteristics of the defendant; promote respect for the law; and provide an adequate deterrence to criminal conduct.

### History and characteristics

Defendant has no significant criminal history. As the PSR correctly notes, although defendant was accused of a kidnapping and murder in Costa Rica, the Costa Rican government was unable to sufficiently support its extradition request as to those two charges. Although extradition as to those charges was denied, defendant will be surrendered to Costa Rica for using a false U.K. passport in that country.

At a previously held extradition hearing there was a finding probable cause that defendant used a false United Kingdom passport in the name of Matthew Francis McCall in Costa Rica in 2005. Additionally, during the extradition hearing it was shown that defendant used his false identity to lure a U.S. citizen to Costa Rica in March 2005; that U.S. citizen was later kidnapped and murdered while in Costa Rica.[2]

---

[2]A complete discussion of the extradition request from Cost Rica and the court's order finding no probable cause as to the kidnapping and murder can be found at *United States v. Matthew Nolan*, 651 F. Supp. 2d 784 (N.D. Ill. Aug. 31, 2009).

### Seriousness of the offenses

The contraband recovered from defendant's cell created a safety and security risk for employees and other inmates at the MCC . Had the items not been found the items posed a risk to Deputy U.S. Marshals transporting defendant to and from court, court personal, and the general public. And while destroying and concealing evidence and contraband does not typically pose the same security and safety risks, it is equally as serious.

### Promote respect for the law

A sentence within the guideline range of 12 to 18 months' imprisonment will promote respect for the law, something defendant has lacked over the past several years. Since his detention, defendant has consistently committed criminal offenses or violated rules at the MCC. Shortly after he was detained, defendant befriended Individual B, who was another inmate at the MCC. Within a short period of time, defendant caused Individual B to send outgoing mail under Individual B's name on defendant's behalf. Defendant also caused Individual B to send a coded messages on defendant's behalf to Individual A during a phone call.

A short time later, defendant committed the instant offenses. First, defendant called Individual A and instructed Individual A to destroy or otherwise conceal the contents of a safe located in defendant's residence. Defendant wanted the items in the safe destroyed or concealed to prevent the FBI from discovering those items. About a week later, MCC officials found contraband intended for an escape in defendant's cell.

Even after the discovery of the razor blade, handcuff pick, rope, harness and other

7

materials in his cell, defendant continued to create safety and security concerns for MCC employees and other inmates. On April 8, 2009, approximately one month after the contraband items were seized from his cell, defendant "stepped over" his handcuffs, causing his hands and cuffs to be in the front of his body while he was being moved to a different cell. When asked what he was doing, defendant responded that he could get out of his handcuffs in 15 seconds. Several minutes later, defendant was observed with the handcuffs hanging off of only his left arm, having removed the handcuff from his right arm on his own.

Finally most recently, as the PSR indicates, (PRS p. 15, lines 350-352), the day on which defendant entered a plea of guilty in this case, he is alleged to have threatened another individual at the MCC. It is not clear from the information whether the individual was another inmate or a MCC employee.

### Afford an adequate deterrence to criminal conduct

A sentence within the guideline range of 12 to 18 months' would deter similar criminal conduct from being committed. This is especially true of other inmates at the MCC or other BOP facilities contemplating plans similar to defendant's plan in this case. Likewise, it is important that people to know that should not be destroying, altering, or falsifying documents to obstruct any federal investigation.

### Conclusion

For the reasons stated above, the United States respectfully requests this Court to impose a sentence within the range of 12 to 18 months' imprisonment.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: ___/s/Michael Chmelar_____
MICHAEL CHMELAR
Assistant United States Attorney
219 South Dearborn
Chicago, Illinois 60604
(312) 886-7655