UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 09 CR 860 |
| | ) | Judge Hibbler |
| | ) | |
| MATTHEW NOLAN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A
DOWNWARD DEPARTURE AND CREDIT FOR TIME SERVED**

Defendant, Matthew Nolan ("Nolan"), by and through his court-appointed

attorney, Eugene Steingold, moves this Honorable Court pursuant to 18 U.S.C. § 3553(e)

and U.S.S.G. § 5K2.0 for a sentence that provides credit for time served, running fully

concurrent with his term of incarceration pending extradition. In the alternative, a

sentence below the Guidelines range of 12-18 months would be sufficient, but not greater

than necessary, to achieve the purposes of sentencing. In support thereof, Nolan states as

follows.

**INTRODUCTION**

Nolan has been held in solitary confinement in the Special Housing Unit ("SHU")

of the Metropolitan Correctional Center ("MCC") since February 26, 2009, when he was

arrested under a provisional warrant pending extradition to Costa Rica. As of the date of

his sentencing, July 7, 2010, Nolan will have been in federal custody for more than

sixteen months—at first pending extradition and now held to answer this indictment. Yet

Nolan's punishment will not end here. When his term of incarceration is complete in this

1

country, the Government will extradite him to Costa Rica to stand trial for Use of a False Document, a charge punishable there by up to six years of imprisonment.

The offenses to which Matthew Nolan pleaded guilty—obstruction of justice and possession of contraband—occurred in early March 2009, just after he was arrested and placed in solitary confinement pending extradition. The Guidelines range for these two offenses is 12-18 months; the Probation Department has concurred in this calculation.

During the summer of 2009, Magistrate Judge Michael T. Mason held three hearings to determine whether to allow Nolan's extradition to Costa Rica. After carefully weighing and considering all of the evidence provided by the Costa Rican government, Magistrate Judge Mason found that there was no evidence supporting probable cause to believe Matthew Nolan participated in any violent crime in Costa Rica. Magistrate Judge Mason did find probable cause that Nolan used a false document while in Costa Rica. The order and opinion granting extradition on that sole charge—Use of a False Document—was entered on August 31, 2009. See United States v. Nolan, 651 F. Supp. 2d 784, 817 (N.D. Ill. 2009).

Nearly two months after that decision, the Government still had not extradited Nolan to Costa Rica. The Government instead charged him in the instant case on October 20, 2009. By the Government's own account, all of the conduct related to this case occurred and became known in March and April 2009.

After the Government filed charges in October 2009, Nolan requested bond in the extradition case in light of the fact that the more serious extradition charges had been dropped and because Nolan would not be extradited until the federal charges had been resolved. Bond was denied. Nolan has remained in solitary confinement in the MCC.

Matthew Nolan has no prior criminal history. He has, however, lost his career, his livelihood, his reputation, and his freedom after being placed in solitary confinement on February 26, 2009. He has been punished immeasurably already, having had to endure lengthy and heart-rending extradition proceedings—fighting serious charges that turned out to be baseless—and the loss of his father and ties to his family.

This Court has discretion to hold that Matthew Nolan's sentence here runs concurrent to his term of incarceration pending extradition—in other words from the time of his arrest on February 26, 2009. See United States v. Campbell, 667 F. Supp. 2d 993 (E.D. Wis. 2009); see also U.S. Sentencing Guidelines Manual § 5G1.3(c). This case warrants the exercise of that discretion. The Government concedes in its sentencing statement that it had knowledge regarding offenses here since March 2009. Though the Government has the prerogative to file an indictment at the time of its choosing within the statute of limitations, there is no reason to allow that decision to dictate a sentence that will require further imprisonment. This is particularly true in light of the reality that Nolan has been held in solitary confinement for more than sixteen months awaiting resolution of a civil extradition proceeding. Notably, Nolan had been held in solitary confinement for roughly six months after the offenses occurred but before the Government brought its charges.

Under these circumstances, this Court should exercise its discretion to afford Matthew Nolan a sentence amounting to time served. As detailed below, Nolan's case also supports a downward departure or variance due to the nature and circumstances of the offense, and the conditions of Nolan's confinement.

**BACKGROUND**

3

Matthew Francis Nolan is a citizen of the United States, an Illinois taxpayer, and a longtime resident of Chicago. For over a decade, he has lived on the South Side of Chicago with his wife and, more recently, his two young sons Parker and P.J. He is a loving husband and father. Prior to this case, he has not been convicted of a crime in the United States or elsewhere.

Nolan has been married since June 1999 and has known his wife for nearly sixteen years. His oldest son, Parker, was born three years after marriage and is seven and a half years old. His son, P.J., is four and a half years old. Mr. Nolan is their mentor, their friend, and their primary caregiver. In short, he is a devoted and loving father.

Numerous people have taken it upon themselves to write to the Court to share their impressions of Nolan, hoping to give some insight into the person before the Court for sentencing. Family, friends, and associates all describe Nolan as a "caring and gentle person," "compassionate," "generous," "courageous," a "generous neighbor," "charismatic," "an independent and stalwart character" with "quiet determination" and a "positive attitude" who is "a strong man full of courage and determination." Nolan routinely goes above and beyond for his family, having saved his brother's life as a child and his wife's life during her pregnancy with their second child. The compassion in Nolan can be seen from the way he has gone out of his way to lend a helping hand whenever possible. Be it a friend who has become gravely ill or a stranger who lost control of his truck on a snowy Chicago night, Nolan has show himself to be a truly courageous person who is willing to risk his personal safety and time to help others in need. One theme reverberates throughout the letters: Nolan's lifelong habit of helping

4

others in times of need and personal crisis—quietly, and often at his own significant expense.

At the age of five, Nolan's brother Jonah fell off a boat in deep running water. Without hesitation and without removing a single article of clothing, Nolan dove in and pulled him out. As the letters from his brother and friend attest, both of which are before this Court as part of the defense filings, had it not been for Nolan's swift action and disregard for his own safety, his brother would have drowned. Similarly, when a friend became ill during the night in December 2006, Nolan was there to help. He raced her to the hospital, made sure she received the appropriate treatment, and stood by her side for twenty-seven hours. When another Chicago friend needed help while Nolan and his family were vacationing in Florida, Nolan did not think twice. He and his family drove through the night from Florida to Chicago to be near their friend and support her.

Though a man of limited means, Nolan shows his generosity however he can. Upon hearing that a family friend needed help making mortgage payments, Nolan—without prompting or even having talked to the family friend—raised $5,000, enough money to help the family friend make it through difficult times. When another friend lost a significant amount of money in a real estate investment, Nolan took it upon himself to investigate the matter and assist his friend. He never asked for money and did everything at his own expense. A singular devotion to his friends and family drives Matthew Nolan.

Nolan's world as a loving father and devoted husband, however, turned upside down on February 26, 2009. After appearing voluntarily with his wife in a federal courtroom on a bankruptcy matter, he was abruptly arrested by federal authorities and put

into solitary confinement at the MCC on a provisional arrest warrant requested by the Costa Rican government. Since that day, Nolan has been held in the SHU at the MCC with only minimal contact with family and friends. The sole reason provided for Nolan's placement in the SHU was his prior military service with the British military.

On April 21, 2009, Costa Rica submitted its request for extradition with supporting materials to the U.S. Embassy in San Jose, Costa Rica. The Costa Rican government later filed a supplemental submission in an attempt to bolster their case. A series of three court hearings were held on the matter during June and July 2009. Because bail pending extradition had been denied, Nolan remained in solitary confinement that entire time.

On August 31, 2009, Magistrate Judge Mason issued an order and opinion explicitly finding that the Costa Rica's case on the violent offenses was built entirely on an "excessive amount of sheer speculation." Nolan, 651 F. Supp. 2d at 817. With regard to the Aggravated Kidnapping charge, the Court held that "Costa Rica did not submit any physical evidence, witness statement or other evidence demonstrating that Nolan . . . used violence against Cohen or took any action that deprived Cohen of his freedom." Id. at 813. The Court similarly concluded that "[t]here is no physical evidence suggesting that Nolan tortured Cohen or engaged in any action that caused his death," despite Costa Rica's conclusory allegations to the contrary. Id. at 815.

The only charge remaining after the Court denied extradition on the other charges was Use of a False Document. The Court ordered that Matthew Nolan remain in custody until "the arrival of agents of the Republic of Costa Rica to for the purpose of his extradition to Costa Rica to face trial on the charge of Use of a False Document." Id.

6

Following Magistrate Judge Mason's ruling on August 31, 2009, Matthew Nolan remained in custody awaiting transfer by the U.S. Marshals Service to Costa Rica where he would stand trial on the Use of a False Document charge. Now, roughly ten months later, Nolan still awaits extradition due to the Government's decision to indict him.

Matthew Nolan accepted responsibility for his conduct which occurred in March of 2009, and on April 29, 2010, he pleaded guilty to Counts One and Five of the indictment. Sentencing has been scheduled for July 7, 2010.

## THE PRESENTENCE INVESTIGATION REPORT

Federal Rule of Criminal Procedure 32(d)(1)(B) requires that the presentence investigation report (hereinafter "PSR") contain a calculation of the defendant's offense level and criminal history.

Nolan concurs with the determinations contained in the PSR.

## POST-BOOKER SENTENCING CONSIDERATIONS

When sentencing an individual, a court must comply with 18 U.S.C. §3553(a)'s primary directive: to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. In making this determination, courts should consider the advisory Sentencing Guidelines, but must weigh all of the § 3553(a) factors. Kimbrough v. United States, 128 S. Ct. 558, 564-565 (2007); United States v. Booker, 543 U.S. 220, 245 (2005). This statute requires district courts to give "respectful consideration" to the guidelines, but "permits the court to tailor the sentence in light of other statutory concerns as well." Kimbrough, 128 S. Ct. at 570 (citing Booker, 543 U.S. at 245-246); see also Gall v. United States, 128 S. Ct. 586, 594-596 (2007). A district court is free to impose a non-guideline sentence when the case falls outside the

7

"heartland," *e.g.*, when the guideline range fails to reflect the **§**3553(a) considerations, or when a case "warrants a different sentence regardless." Rita v. United States, 127 S. Ct. 2456, 2465 (2007).

As Booker emphasized, under the Sentencing Reform Act, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Booker, 125 S.Ct. at 760 (quoting 18 U.S.C. § 3661). After Booker, courts are therefore required to consider factors that the Guidelines previously discouraged or rejected, such as Nolan's physical, mental and emotional condition, as well as Nolan's family ties and responsibilities.

In this case, this Court should exercise its discretion to impose a sentence below the suggested Guidelines range for four reasons: (1) the extraordinary circumstances of Nolan's lengthy incarceration pending extradition; (2) Nolan's exemplary personal history and characteristics; (3) offenses to which Nolan plead guilty reflect his diminished capacity after being placed in solitary confinement and held without medications; and (4) the harsh conditions of Nolan's confinement.

### NOLAN'S PENDING INCARCERATION

This Court has discretion to "adjust" Matthew Nolan's sentence so as to make it, effectively, fully concurrent with his term of incarceration pending extradition. See United States v. Campbell, 667 F. Supp. 2d 993 (E.D. Wis. 2009). District courts have this power pursuant to their general sentencing discretion under 18 U.S.C. § 3553(a) and Booker, 543 U.S. 220, which allow them to reduce a sentence so as to make it fully concurrent. See, e.g., United States v. Villegas-Miranda, 579 F.3d 798, 803 (7th Cir.

2009) (finding legally meritorious the argument that the district court may reduce a sentence based on the lost opportunity to serve it concurrently with state time); Campbell, 667 F. Supp. 2d 993; United States v. Tariq, No. 06-CR-336, 2008 WL 5210869, at *3 (E.D. Wis. Dec. 12, 2008) (collecting cases addressing such adjustments and granting downward adjustment); United States v. Brannon, 377 F. Supp. 2d 667, 670-71 (E.D. Wis. 2005) (addressing ability of a federal court to modify a federal sentence to make it fully concurrent with an undischarged state sentence). Consistent with this authority, this Court should exercise its discretion under Booker and § 3553(a) to impose upon Nolan a term of imprisonment that gives credit for time served and runs fully concurrent with his incarceration pending extradition.

This Court's broad discretion to impose a concurrent sentence is consistent with the Guidelines policy statement under § 5G1.3, which provides for downward departures to allow sentences imposed to run "concurrently" or "partially concurrently" as needed "to achieve a reasonable punishment for the instant offense." U.S. Sentencing Guidelines Manual § 5G1.3(c); see United States v. Brannon, 377 F. Supp. 2d 667, 670 (E.D. Wis. 2005) (holding that § 5G1.3(c) allows "a downward adjustment granted by the court at the time of sentencing" to award credit for time already served); see also United States v. Walker, 98 F.3d 944, 945 (7th Cir. 1996) (The discretion that the sentencing guidelines grant the district judge to make the sentence in a case such as this concurrent or consecutive, or partly one and partly the other, is very broad.").

In light of his lengthy incarceration under difficult circumstances—more than sixteen months in solitary confinement within the SHU of the MCC—Matthew Nolan requests that this Court invoke its broad discretion to take into account these

9

circumstances to fashion a sentence that will have run fully concurrent with his current incarceration.

**HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Section 3553(a) instructs that the Court shall consider the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Matthew Nolan is 41 years old. He was born in England and immigrated to Chicago in 1992. He has been happily married for more than ten years and is the loving father of two young boys who look up to and love their father. Nolan suffers from Attention Deficit Disorder and was taking prescribed daily doses of Adderall. (Letter from Dr. Reff, treating psychiatrist, dated April 7, 2010, is attached hereto as Exhibit 1). As reflected in the PSR, he has volunteered and served in British military from 1986 through 1991.

As the attached character letters demonstrate, Matthew Nolan is a devoted father, loving husband, committed neighbor, and tireless friend. He is a selfless individual, who is always willing to help others regardless of the costs to himself. Countless times he has gone above and beyond to help friends and family, having saved his brother's life, his wife's life, and putting himself at risk to help those around him. (Character reference letters and a certificate from Chicago Police Department are attached hereto as Group Exhibit 2A, 2B, 2C, and 2D). These extraordinary efforts and prior good work warrant a downward variance. See United States v. Thurston, 544 F.3d 22 (1st Cir. 2008) (affirming sentence of three months' imprisonment despite Guidelines range of 63-78

10

months based in part on the defendant's "charitable work, community service, generosity with time, and . . . assistance of others").

## NATURE AND CIRCUMSTANCES OF OFFENSE

In February 2009, after his arrest, Nolan was taken to the MCC and placed in the SHU due to his military background and experience. As a result, along with the few other detainees held in the SHU, Nolan was confined to his cell for 23 hours a day, received minimal commissary, and had extremely limited contact with the outside world. Nolan, who has never been incarcerated before, was also temporarily denied his medications. This, despite being diagnosed at the MCC on February 26, 2009, day of his arrest, "with Axis I: Attention Deficit Disorder (ADD), with Hyperactivity." (PSR, p.14, lines 304-306). According to Dr. Reff, his treating psychiatrist "[G]iven Mr. Nolan's response to Adderall XR, it is my opinion, based on a reasonable degree of medical psychiatric certainty that an abrupt discontinuation of Aderall XR would rapidly have led to a recurrence of mood instability, diminished focus and attention and most importantly, a recurrence of his impulse control and judgment." It took approximately one week before Nolan, who has been taking daily doses of Adderall since 2005, to receive any medications from MCC. (The MCC ultimately prescribed different medication—Venlafazine).

Soon after arriving at the SHU, he was approached by another inmate, identified in discovery materials as CI-656, who in fact has been acting as government's confidential informant ("CI"). Apparently, (according to 28 CFR Ch. V, §541.23 (a), "Protection Cases") this CI was placed in SHU as an "inmate informant." As any informant, who is always seeking to gain a benefit and possibly a lower sentence, this CI

11

concocted and proposed an escape plan to Nolan in exchange for $100,000,000.00 in cash

(emphasis added). This proposition is documented by an exchange of written notes

between CI and Nolan. CI then negotiated with and notified MCC officials, who in turn

searched Nolan's cell. On March 11, 2009, approximately 31 feet of rope made from a

bed sheet, a cloth harness, a piece of razor blade and a metal pen clip were discovered in

his cell. (Photocopies of these items are attached hereto as Exhibit 3).

It is clear from the discovery materials, the plan was developed by CI and

involved using CI's contacts.

> "[B]asicly (sic) of options he has decided to use my C/O that knows my cuz (sic)
> who is a City Police (SWAT) guy that this C/O knows . . . My guy C/O
> midnights would give us complete info (Intel) on current Security Status . . . ."
> (CI's letter to Mr. Lee, of MCC Chicago, dated March 8, 2009).

In a handwritten note (CI's letter to Mr. Lee, dated March 9, 2009), CI states that

as part of his participation:

> "5.      I have requested 100 million up front in my Attorneys Account: Nolan
> will explain how to accomplish that?
> 6.      Once in Account C/O Midnight Shift will give me Intel for Nolan's access
> to back stairwells to E&E…. I have boat accommodations…."

In return CI demanded from the authorities the following, in the note dated March

9, 2009:

> "My Request would be concerns for:
> 1-      Families & myselfs Identities & Safety?
> 2-      Keep "Substantial" amount of assets & the funds actually sent. This way I
>         keep my Self Honest without cutting Corners??
> 3-      I be placed in a half way house or home confinement ASAP."

As can be seen from the photograph of MCC, attached hereto as Exhibit 4, the

windows in the institution are approximately 5 inches wide. The SHU is located on the

12

11th floor. Nolan was placed on 11th floor because of his military experience. It would clearly be impossible for any person, experienced or not, to attempt to escape from the 11th floor of the MCC with approximately 30 feet of rope made from a bed sheet. Clearly, Nolan's involvement in this "caper" was impacted by diminished impulse control and judgment due to interruption of his medication as well as the trauma of being ripped from his family and placed in solitary confinement with little contact with outside world. Also, he was prodded by CI who saw an opportunity to gain additional rewards from the government.

With respect to the obstruction charge, again conversations quoted by the Government can be attributed to the interruption of Nolan's medication. In addition, the government seized the safe, which turned out to be empty. The government presumably has subjected the safe to a forensic examination —yet there is no evidence of tampering or allegations that a single item was in fact removed from the safe. The Government in its version of the offense and in sentencing memorandum provides the following excerpt from a telephone conversation with individual A:

> "Maybe keep a couple, but the rest, go put them in like the most…and uh, as for like the iron thing, and anything else…and ah like…any plane tickets, bus tickets, whatever…they should go…somewhere safer, but more unusual…you know what I mean?"

If the government is referring to "the iron thing" as a firearm, a registered gun was in fact was recovered and inventoried by the FBI, along with other numerous documents, during the search of the house. In essence, the government offers no evidence that anything was destroyed or otherwise withheld during an investigation.

### SENTENCING ISSUES

### PRE-INDICTMENT DELAY

13

1.      **The District Court has the authority to issue a below Guidelines sentence.**

Nolan has been at the MCC since February 26, 2009. As reflected in the MCC Memo dated March 24, 2009, incident report pertaining to items found in Nolan's cell was forwarded to FBI for possible prosecution. (Copy of the report is attached hereto as Exhibit 5). On October 20, 2009, Nolan was charged with possession of prohibited objects intended to facilitate escape and with seeking to obstruct an FBI investigation involving a safe in his residence. The government delayed returning this indictment even after Magistrate Judge Mason on August 31, 2009, found probable cause to extradite Nolan to Costa Rica on a false document charge.

In United States v. Villegas-Miranda, 579 F.3d 798, 104 (7th Cir. 2009), an illegal reentry case, Seventh Circuit found legally meritorious defendant's argument that district court may issue a lower sentence to compensate for charging delays. Similarly, United States v. Barrera-Saucedo, 385 F.3d 533 (5th Cir. 2004) (in illegal reentry case, district court has discretion to depart downward for all or part of time defendant served in state custody from time federal immigration authorities located him); United States v. Saldana, 109 F.3d 100, 104 (1st Cir. 1997) (departure appropriate for preindictment delay, even if unintentional, if it produces an unfair or unusual sentencing result); United States v. Sanchez-Rodriguez, 161 F.3d 556, 563-64 (9th Cir. 1998) (en banc) (district court acted within its discretion when it departed in illegal reentry case in part because delay in bringing the federal charge prejudiced the defendant's opportunity to obtain a concurrent sentence); United States v. Garcia, 165 F. Supp. 2d 496 (S.D.N.Y. 2001) (departure granted where defendant served nine months for passport fraud before he was charged with illegal reentry even though he could have been charged immediately).

What might constitute a reasonable (six-month) delay in other circumstances is nonetheless grounds for a downward variance at a minimum in this case. Nolan was

originally confined pending hearings in a civil extradition proceeding, during which he was exonerated of all allegations out of Costa Rica apart from a single non-violent offense. Nolan has been held in solitary confinement for more than sixteen months.

## CONDITIONS OF CONFINEMENT

**2. The District Court has the authority to consider pretrial conditions of confinement as a mitigating factor at sentencing**.

Since his arrest on February 26, 2009, Nolan has been placed into Administrative Detention under increased security at the MCC. The basis for this placement is his prior military service as a member of the British Special Air Service. (Exhibit 5,MCC Memo dated March 24, 2009). According to 28 CFR Ch. V, §541.22, "[A]dministrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self …which serves to remove the inmate from general population." As a result of this placement Nolan has been confined to his cell—which has only one window, less than a foot wide, and is spray-painted white--for 23 hours a day. On weekends, beginning Friday at 11 a.m. through 7 a.m. Monday, he is locked in his room for 68 hours. Although §541.22 (d) provides that "the Warden shall give an inmate housed in administrative detention same general privileges given to inmates in general population", Nolan was not given an opportunity to exercise and his access to reading materials has been limited. He has no access to radio or television. Since February 26, 2009, Nolan has not been outside of his cell, except for visits with his attorneys and family and several court appearances related to this criminal case. All court appearances held in the extradition matter—including the three hearings—were conducted via a television monitor from the SHU. Nolan had no contact visits for the first 10 months of his incarceration and did not see his children at all during that time. Although his father was

terminally ill in England, Nolan was denied an opportunity to speak to him on the telephone prior to his death.

In United States v. Ramirez-Gutierrez, 503 F.3d 643 (7th Cir. 2007), the Seventh Circuit described the conditions which could be a permissible ground for mitigating a sentence, citing United States v. Pressley, 345 F.3d 1205 (11th Cir. 2003) (where defendant spent six years in presentence confinement, including 5 years in 23-hour a day lockdown and where he had not been outside in 5 years, district court erred in holding that departure not available).

Here, while Nolan's period of confinement will have reached roughly sixteen months by the time of sentencing, the conditions are similarly harsh.  This Court can and should consider these extraordinary and harsh circumstances when imposing a sentence.

## DIMINISHED CAPACITY

**3.     Court can consider the doctrine of "diminished capacity" as grounds for lesser sentence.**

According to U.S.S.G. § 5K2.13, in relevant part, the diminished capacity policy statement reads:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

As noted by Dr. Reff, Nolan's ability to think rationally was affected by the lack of medication after his arrest.  In United States v. Miranda, 505 F.3d 785, 792 (7th Cir. 2007), the Seventh Circuit held that diminished capacity is a ground of "recognized legal merit" for a lesser sentence.  The Seventh Circuit has also found it to be abuse of discretion when judges have not considered or addressed uncontested evidence of diminished capacity.  See, e.g., United States v. Williams, 553 F.3d 1073, 1084 (7th Cir.

16

2009); <u>Miranda</u>, 505 F.3d at 792). In addition, the effects of solitary confinement on a person are well documented and include reduced brain function, hallucinations, panic attacks, depression, chronic apathy, lethargy, and cognitive dysfunction due to the minimal social interaction that occur during prolonged incarceration in isolation and close quarters. (<u>See</u> Atul Gawande, Hellhole: The United States Holds Tens of Thousands of Inmates in Long-Term Solitary Confinement. Is this Torture?, <u>The New Yorke</u>r, March 30, 2009). There is no doubt that initial denial of prescribed medications, which Nolan was regularly taking on a daily basis since 2005, affected his ability to think clearly and rationally and led to his dealings with CI.

### FINES AND RESTITUTION

While the fine range for this offense is from $3,000 to $30,000 pursuant to §5E1.2 (c )(3), (PSR, p.18, lines 457-458), imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case. Nolan's financial condition is such that he is currently unable to pay any significant fine, and is not likely to be able to do so in the foreseeable future. (PSR, p.16, lines 384-420). According to U.S.S.G. § 5E1.2(a) a fine is not recommended if defendant is unable to pay.

Nolan respectfully requests that no fines be imposed.

### CONCLUSION

Matthew Nolan has accepted responsibility through his sixteen months of solitary confinement. Both he and his family have suffered immeasurably from his prolonged incarceration and both will continue to suffer. (Recent studies demonstrate that prolonged parental incarceration is likely to be associated with a range of negative child development outcomes).

Upon resolution of this case, Nolan will not walk free but instead must await extradition to Costa Rica, a country lacking our well-developed criminal justice system, where he must stand trial on the false document charge. Accordingly, it is not necessary to further imprison Nolan to meet the §3553(a) punishment goals of deterrence, protection of the public, or respect for the law. Further imprisonment would serve a purely punitive purpose. Under these extraordinary circumstances, Nolan respectfully submits that a sentence of "time served" is a fair and appropriate result here.

WHEREFORE, Matthew Nolan respectfully requests that this Honorable Court grant him a sentence of time served or, in the alternative a downward variance from the otherwise applicable guideline range, taking into account the extraordinary circumstances of this case, Nolan's personal and family situation, and the conditions of his current incarceration,

MATTHEW NOLAN,

By: s/Eugene Steingold
Eugene Steingold, his attorney

CERTIFICATE OF SERVICE

The undersigned Attorney hereby certifies that in accordance with Fed. R. Grim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF)

DEFENDANT MATTHEW NOLAN'S SENTENCING MEMORANDUM

was served pursuant to the District Court's ECF system as to ECF filers, if any, and was sent by first-class -mail on June 29, 2010 to the following:
none

Respectfully submitted,

s/Eugene Steingold
Attorney for Defendant Matthew Nolan
111 West Washington Street, Suite 1051
Chicago IL 60602
(312) 726-1060

18